*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re B. V. PROVENZANO, Minor.

UNPUBLISHED
May 14, 2019

No. 345747
Macomb Circuit Court
Family Division
LC No. 2014-000260-NA

Before: MURRAY, C.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

Respondent-mother[1] appeals as of right the trial court's order terminating her parental rights pursuant to MCL 712A.19b(3)(c)(*i*) (182 or more days have elapsed since issuance of an initial dispositional order, conditions that led to adjudication continue to exist, and no reasonable likelihood conditions will be rectified within a reasonable time), (g) (parent failed to provide proper care or custody and no reasonable expectation parent will provide proper care or custody within a reasonable time), and (j) (reasonable likelihood child will be harmed if returned home). We affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Respondent suffered a closed-head injury in 2008 when she was attacked at work. As a result, she was diagnosed with post-traumatic stress disorder (PTSD), an unspecified seizure disorder, and problems with memory. Respondent also was diagnosed with bipolar depression, generalized anxiety disorder, and attention-deficit/hyperactivity disorder (ADHD). Respondent had an IQ of around 80, which placed her in the borderline range for normal cognitive functioning. An expert in neuropsychology, Dr. Patrick Ryan, stated that respondent's disability allowed her to learn and understand new concepts, such as the concept of good parenting, but that she struggled with executing actions in conformance with those concepts. A licensed psychologist, Terry Rudolph, Ph. D., agreed with Dr. Ryan regarding respondent's abilities and

---

[1] The minor child's father also was a respondent in this case and had his parental rights terminated, but he has not filed an appeal of that decision.

deficits. Rudolph and Dr. Ryan also agreed that respondent needed in-person, one-on-one coaching with explanations and examples to improve her parenting.

When the minor child was just eight months old, child protective services (CPS) was alerted that respondent possibly was living in her car, had no money, and had been involved in a drug deal. The minor child was taken into foster care in November of 2014 when the CPS investigation found that respondent was mentally unstable, had no income, had driven a friend to buy heroin while the minor child was in the car, was living in a motel but would no longer be able to stay there after a few days, and had refused any and all services. After a two-day adjudication trial, where the trial court determined that the minor child would not be safe in respondent's care for the foregoing reasons, the trial court ordered the Department of Health and Human Services (DHHS) to create a parent-agency agreement (PAA) that provided reunification services tailored to respondent's disability in compliance with the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*.

At the first dispositional review hearing in March of 2015, the trial court went over respondent's barriers to reunification and the goals in her PAA that would help her overcome her barriers. The trial court appointed a guardian ad-litem (GAL) for respondent so that she could better understand the services being offered. The trial court also included ADA compliance as a goal in the PAA and repeatedly explained to respondent, her attorney, and her GAL that DHHS would do everything in its power to assist respondent in getting the services she needed. The PAA required respondent to inform her attorney, her GAL, her DHHS caseworker, or the trial court if she felt there were services that would benefit her or if she needed to be accommodated in any manner. The primary goals of the PAA were to remedy the issues that led to adjudication—primarily mental health problems, substance abuse concerns, lack of suitable housing, and lack of legal income. The PAA required respondent to see a psychiatrist, take her prescribed medications, attend psychotherapy regularly, sign medical releases so that DHHS could monitor her care, participate in a psychological evaluation, submit to random drug screens, find appropriate housing for herself and the minor child, and to find a legal form of income.

In an effort to address respondent's disability so that she could achieve those goals, DHHS made a wide array of accommodations for respondent. Briefly, respondent's DHHS caseworker performed the random drug screens at the DHHS office instead of requiring respondent to call in every morning and find transportation to the testing facility; the caseworker drove respondent to her psychological evaluation and waited for her while it was conducted; she offered to set up transportation to and from psychotherapy visits; she texted her reminders of appointments; and she went to respondent's home to help her apply for housing and cash assistance through various state and federal programs and to sign up for psychiatric and psychotherapy treatment at the Judson Center, a branch of Macomb County Community Mental Health (CMH). DHHS also initiated an in-home, one-on-one parenting course with Hands Across the Water (HATW), which provided nearly 18 weeks of in-home coaching for respondent, and an additional eight months of coaching during parenting-time sessions at the DHHS offices. The DHHS caseworker observed respondent's parenting-time sessions and offered one-on-one, hands-on coaching during those visits.

Over the course of the 3.5 years that followed, respondent was, at best, sporadic with her therapy appointments, inconsistent or even outright non-compliant with her prescribed

medications, and as late as April of 2018 was involuntarily hospitalized for a mental breakdown. In September of 2017 she tested positive for cocaine. For a vast majority of the proceedings, she lived in a home with her parents or her new husband, Adam.[2] The minor child was not welcome at either home because her parents refused to allow it and her husband Adam eventually obtained a personal protection order (PPO) against respondent after emotional and physical outbursts. At the time of the termination hearing, respondent planned to move in with her friend, who had a long history of felony convictions relating to financial fraud and controlled substances. Respondent eventually was approved for social security income. Most notably, however, respondent's parenting skills, despite the intensive services offered, had not improved in any respect.

On September 11, 2018, after a 14-day termination hearing that spanned nearly eight months, the trial court concluded that DHHS had made reasonable efforts for reunification in compliance with the ADA and terminated respondent's parental rights to the minor child pursuant to MCL 712.19b(3)(c)(*i*), (g), and (j). This appeal followed.

## II. ADA COMPLIANCE

Respondent argues that the trial court clearly erred in finding that DHHS made reasonable efforts to reunify respondent with the minor child in accordance with the ADA. We disagree.

## A. STANDARD OF REVIEW & APPLICABLE LAW

This Court reviews for clear error a trial court's decision regarding whether "reasonable efforts were made to preserve and reunify the family." *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A trial court clearly errs when "we are definitely and firmly convinced that it made a mistake." *In re White*, 303 Mich App 701, 709-710; 846 NW2d 61 (2014).

"Under Michigan's Probate Code, [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). "As part of these reasonable efforts, [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86, citing MCL 712A.18f(3)(d). DHHS, in establishing a plan for reunification services "must comply with the ADA." *In re Terry*, 240 Mich App 14, 25; 610 NW2d 563 (2000). "Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,

---

[2] During the proceedings, respondent had another child with her new husband, Adam. That child temporarily came within the trial court's jurisdiction, but the case was dismissed after respondent agreed to move out of her husband's house and signed a custody consent order providing her husband with sole physical custody. The proceedings with respect to respondent's second minor child are not the subject of this appeal.

or be subjected to discrimination by any such entity.' " *In re Hicks/Brown*, 500 Mich at 86, quoting 42 USC 12132.

In an effort to achieve that goal, DHHS "must make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service' provided." *In re Hicks/Brown*, 500 Mich at 86, quoting 28 CFR 35.130(b)(7). When DHHS fails to do so, it "failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." *In re Hicks Brown*, 500 Mich at 86. While DHHS has the duty to provide ADA-compliant services, a respondent has a concomitant duty to "participate [and] demonstrate that they sufficiently benefited from the services provided." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). In that regard, this Court has held that, "a parent, whether disabled or not, must demonstrate that she can meet [her children's] basic needs before they will be returned to her care." *In re Terry*, 240 Mich App at 28.

## B. ANALYSIS

To begin, we note that we have reviewed the voluminous record in this case and are well-satisfied that DHHS was relentless in its efforts to provide services individually-tailored to respondent and her disability. Additionally, the trial court took every precaution possible to ensure that respondent was provided with enough time and accommodations to benefit from the services offered by DHHS. The fact of the matter is, respondent merely refused to participate in those services in an earnest manner and thus, was unable to benefit from them. While we are not blind to the role of respondent's disability in this case, we also are equally certain that the trial court reached the correct result. As this Court previously has held, "[i]f a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." *Id*. (quotation marks omitted).

Respondent first argues that DHHS failed to abide by the ADA because the parenting classes and coaching provided were not individually-tailored to be effective in light of respondent's disability. Dr. Ryan, respondent's own expert witness, testified that respondent's disability required that she be provided in-person, hands-on coaching, with examples and personal instructions. Rudolph, in his psychological evaluation, concluded similarly. The record shows that respondent was provided with 18 weeks of in-home parenting coaching by HATW. Throughout the proceedings, the HATW caseworker stated that she provided redirection for respondent when she made mistakes, explained to her why certain actions were harmful or inappropriate, and demonstrated the proper way to parent in respondent's presence. At the end of 18 weeks, respondent still had not improved. Yet, HATW continued to provide coaching to respondent at her parenting-time sessions at the DHHS office. Those coaching sessions were for two to three hours per week over the span of eight months. Still, respondent's parenting skills failed to improve.

During all of those times, respondent also had parenting-time sessions observed by her DHHS caseworker, who also engaged in coaching, although it was not typical for DHHS to do so. Respondent's DHHS caseworkers all testified that they would redirect respondent when she made mistakes, discuss why a specific choice by respondent was problematic, and then provide her examples of how she should handle the situation in the future. All of respondent's coaches

reported that respondent would accept the directions at the time, but would not incorporate or adopt them in the future. At the end of the immense amount of one-on-one, hands-on coaching in this case, respondent still had the same issues with respect to her parenting.

Dr. Ryan, an expert in neuropsychology, testified that respondent was able to understand the concepts of being a good parent and to learn new concepts when taught by example and in-person. Respondent, however, refused to do so. Dr. Ryan explained that respondent's issue was with execution of ideas, meaning she understood the concepts, but had trouble performing in accordance with those concepts. When Dr. Ryan was informed regarding the services provided to respondent by DHHS and HATW, Dr. Ryan admitted that he would have expected respondent to have improved more. Respondent's lack of improvement, according to Dr. Ryan, was caused because she did not believe that she had any problem with her parenting skills. Respondent's own testimony during the termination hearing confirmed Dr. Ryan's assessment when she repeatedly stated that her only barrier to being an adequate parent was the court's involvement. In fact, when DHHS attempted to refer respondent to additional coaching with infant mental health (IMH), respondent refused to follow-up with them because she did not believe she needed further lessons. Furthermore, respondent openly admitted that she had not learned anything from her parenting coaches that she did not already know. Dr. Ryan testified that considering respondent's non-cooperative attitude, her utter lack of improvement despite intensive coaching, and her unwillingness to accept any additional services, it was unlikely, although not impossible, that respondent ever would improve her parenting skills. When asked if he believed DHHS and HATW had engaged in appropriate services under the ADA, he stated that the coaching was "a full court press." Respondent's DHHS and HATW caseworkers agreed with Dr. Ryan's conclusion.

The trial court, in its findings of fact regarding the reasonableness of the reunification services in light of respondent's disability, specifically stated that it found Dr. Ryan's testimony in that regard to be credible. "We must defer to the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016). Therefore, the trial court did not clearly err when it found that the services provided by DHHS to improve respondent's parenting was, as Dr. Ryan testified, tailored to respondent's disability. See *id*. Consequently, the trial court also did not clearly err in determining that the parenting services offered by DHHS complied with the requirements of the ADA. See *In re Hicks Brown*, 500 Mich at 86. Respondent's failure to benefit from those services does not automatically render them reasonably ineffective pursuant to the ADA, as respondent argues, but rather, means that respondent failed to fulfill her own concomitant duty to "participate [and] demonstrate that [she] sufficiently benefited from the services provided." *In re Frey*, 297 Mich App at 248.

Respondent next argues that, even if the parenting services rendered were ADA compliant, she should have been provided more time to benefit from them. Respondent's argument is belied by the testimony of her expert witness. As discussed, Dr. Ryan testified that, in considering all the circumstances involved in the case, respondent should have benefitted from the services already given. Dr. Ryan also opined that respondent likely never would improve her parenting. He used the term "quite guarded" when asked about respondent's prognosis with respect to parenting improvement and explained that any improvement would be a "long haul." In addition to Dr. Ryan's testimony, the DHHS and HATW caseworkers, who spent an immense amount of time observing respondent's interactions with the minor child and attempting to coach

her to improve, all testified that respondent had not and would not make any improvement in her parenting skills. Considering that the trial court found those witnesses to be credible, it did not clearly err in finding that respondent had been given adequate time to show improvement in light of her disability. See *id*.; see also *In re Medina*, 317 Mich App at 227.

Respondent argues that DHHS failed to provide adequate accommodations in her search for suitable housing. The record shows that when the case began respondent was living in a motel. The DHHS caseworker at the time attempted to help respondent find housing. She sat down with respondent to fill out applications for federal and state assistance. Despite this assistance, respondent decided to live at a house in Detroit where she was not given a lease and with a landlord that admittedly rented rooms to criminals. Respondent then did not request any additional help to find housing, but instead chose to live with her parents or her new husband, places where the minor child could not live. Respondent's last housing effort was to live with her friend, a known felon. Additionally, respondent made these housing decisions without her or her GAL asking for any input from DHHS.

DHHS cannot provide a service that it is unaware is needed, and respondent never informed it of her housing needs. See *In re Hicks/Brown*, 500 Mich at 87. Furthermore, she made it abundantly clear throughout the proceedings that she would choose her own place to live and would not accept DHHS help in doing so. Her failure to request any additional help after the DHHS caseworker sat down and helped her apply for federal and state housing assistance was not due to a lack of effort by DHHS. See *id*. Consequently, the trial court did not clearly err in determining that DHHS made reasonable efforts for reunification in light of respondent's disability pursuant to the requirements of the ADA. *Id*.

### III. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court clearly erred when it found that there is clear and convincing evidence to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). We disagree.

### A. STANDARD OF REVIEW & GENERAL LAW

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App at 709. A trial court's findings of fact are clearly erroneous if "we are definitely and firmly convinced that it made a mistake." *Id*. at 709-710. " 'To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence.' " *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 635; 853 NW2d 459 (2014), quoting *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

### B. MCL 712A.19b(3)(c)(*i*)

The first ground relied upon by the trial court, MCL 712A.19b(3)(c)(*i*), states that a parent's rights may be terminated if "182 or more days have elapsed since the issuance of an initial dispositional order" and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Here, the "initial dispositional order" was issued in March of 2015,

and respondent's parental rights were terminated on September 11, 2018. Thus, significantly more than 182 days had passed since that order, fulfilling the first requirement of MCL 712A.19b(3)(c)(*i*).

Next, we consider whether "[t]he conditions that led to the adjudication continue[d] to exist" at the time of termination. MCL 712A.19b(3)(c)(*i*). "This statutory ground exists when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services . . . ." *In re White*, 303 Mich App at 710 (quotations omitted). Participation in and completion of certain portions of a service plan is not enough where a parent "fail[s] to demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication in th[e] matter[.]" *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

In this case, the primary reasons that the minor child was brought into foster care were concerns regarding respondent's ability to parent, mental health, housing, income, and involvement with controlled substances. As the proceedings progressed, the trial court focused its concern on parenting, mental health, potential drug and medication abuse, and housing. The trial court did not clearly err in finding that those conditions continued to exist at the time of termination. MCL 712A.19b(3)(c)(*i*). With respect to parenting and housing, the analysis is the same. At the time of termination, respondent still lived with her parents, where the minor child was not welcome to live, and her only other plan was to move in with her friend, who was a felon. Additionally, respondent had not improved her parenting skills despite attempts over three years. The issues with respondent's parenting skills were static throughout the proceedings. Specifically, both at the time of adjudication and at the time of termination, respondent struggled to remain focused on the minor child for more than a few hours, refused to appreciate the minor child's needs and wants before hers, interacted with the minor child in a manner that was not age-appropriate, showed up late for sessions, left sessions early, took significant breaks during sessions sometimes requiring DHHS intervention, became angry when the minor child did not want to do what she wanted to do, continued to give the minor child candy even after DHHS and a dentist instructed her to stop, smoked near him, and generally failed to ensure his safety. Respondent's failure to remedy those issues was in direct disregard of her PAA.

At the adjudication phase, the trial court also expressed concern about respondent's mental health and involvement with drugs. The trial court and DHHS were aware that respondent suffered a closed-head injury that caused her to have memory and anger issues. A psychiatrist's evaluation at around the time of adjudication expressed concern that respondent was exaggerating the effects of her injury to seek pity or to use as an excuse. Respondent was diagnosed with bipolar depression, an unspecified seizure disorder, PTSD, ADHD, and generalized anxiety disorder. Respondent admitted during one psychiatric evaluation that she could not properly parent if she did not take her medication. There also was concern that respondent was misusing or abusing her prescription medication, which included controlled substances such as Adderall, Xanax, and Norco. Respondent's PAA set out certain goals to address those areas including taking medications regularly, attending therapy, following the advice of her psychiatrist and therapist, participating in drug screens, and signing releases so that DHHS could assess her progress. DHHS assisted respondent in receiving services through the Judson Center, a branch of Macomb County Community Mental Health.

As the case progressed, respondent was, at best, sporadic in her attendance at therapy. She switched therapists at least once due to being discharged for lack of attendance. When she returned to the Judson Center after the discharge, her new psychiatrist noted that respondent appeared to be attempting to manipulate the psychiatrist into prescribing higher doses of Adderall. Respondent's therapist noted that respondent became "irate" when she was not prescribed the medications she believed she needed. Respondent also went to various pain clinics where she was prescribed Norco. Those doctors observed that respondent appeared to be "drug shopping," claiming that she lost prescription bottles and needed early refills. Respondent's new husband claimed that respondent was abusing prescription medications as well, and stated that she attempted to break his safe where he kept his Vicodin.

Respondent's inability to handle her medication also was an issue that persisted throughout the proceedings in violation of the PAA. At the termination hearing, respondent plainly admitted that she did not take her medications as prescribed. At one hearing date she had two bottles of Adderall in her purse that had been filled within days of one another. One of the bottles was empty despite the bottle indicating that there should have been pills remaining. At another hearing, respondent produced a plastic baggy of around 15 loose pills, which she struggled to identify. She also could not recall which of them she had taken that day. Respondent's drug tests further suggested that respondent had a serious problem with her medications. Over the course of years of drug screenings, respondent tested positive only one time for the medications intended to treat her bipolar depression and seizures. In those same screens, respondent's levels of Adderall, Xanax, and Norco varied widely, leading to concerns that she was not taking her prescribed drugs as directed. Additionally, respondent tested positively for Xanax in 2018 when she and her doctor agreed that she no longer was supposed to be taking that drug, considering its potentially dangerous interaction with Norco.

Respondent's inability to control her medication or regularly attend therapy eventually spiraled out of control in April of 2018 when she was involuntarily hospitalized for 13 days. Yet, when she exited the hospital, she refused to follow her discharge instructions to return to therapy and she continued to take her medications improperly. In fact, it was the hearing just three days after respondent left the hospital that she had all of her medications hidden in her bra. As the termination hearing came to a close, respondent's psychiatrist expressed additional concern regarding respondent's ability to parent considering her likely abuse of Xanax and Norco. Lastly, respondent tested positive for cocaine in September of 2017, around 2.5 years after adjudication.

Considering all of this evidence, the trial court did not clearly err in determining that respondent's issues that led to adjudication—parenting, mental health, medication management, and housing—still remained at the time of termination. MCL 712A.19b(3)(c)(i).

Finally, pursuant to subsection (c)(i), we must consider whether "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(i). With respect to this, respondent specifically argues that she should have been given additional time to fix her problems due to her disability. However, Dr. Ryan provided specific testimony that respondent had been provided ample and appropriate opportunities to become a better parent, but had not done so. In light of all of the circumstances of the case, Dr. Ryan opined that he was "quite guarded" about the possibility of respondent

improving. The DHHS and HATW workers agreed with that conclusion, and one DHHS caseworker testified that a reasonable time to rectify the parenting issues, even for someone with a disability, had already passed.

The record shows that respondent would not rectify her housing issues as she repeatedly chose homes that she knew were not suitable for the minor child. With regard to respondent's mental health and misuse of prescription drugs, Dr. Ryan testified that respondent's mental health relied heavily on her taking her medications as prescribed. Respondent agreed, citing her inability to parent without her medication. Even so, after years of treatment, three different psychiatrists, the assistance of her father, text message reminders from DHHS workers, orders of the trial court, and a forced hospitalization, respondent still was unable to effectively manage her medications. Dr. Ryan, in considering respondent's circumstances, testified that if she ever was going to be able to manage her medications, she would have done so by now. That, in turn, meant that respondent would not be able to manage her mental health issues.

Thus, given that the minor child was taken into foster care when he was eight months old and termination occurred when he was over four years old, the trial court did not clearly err in finding that "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*).

As such, we need not consider the remaining statutory grounds for termination, because clear and convincing evidence of one ground is sufficient. See *In re Brown/Kindle/Muhammad Minors*, 305 Mich App at 635.[3]

## IV. BEST INTERESTS

Respondent argues that the trial court clearly erred in finding that termination of her parental rights was in the best interest of the minor child. We disagree.

---

[3] Despite the fact that we need not consider the trial court's termination of respondent's parental rights pursuant to MCL 712A.19b(3)(g) and (j), we note, briefly, that it is respondent's same failure to become a better parent, take care of her mental health, use her medications appropriately, and to obtain appropriate housing that establishes clear and convincing evidence that respondent "fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age," MCL 712A.19b(3)(g), and that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent," MCL 712A.19b(3)(j). After all, respondent's "failure to participate in and benefit from a service plan is evidence" both "that the parent will not be able to provide a child proper care and custody," and "that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App at 710-711. Thus, for the same reasons termination was proper pursuant to (c)(*i*), it also was proper pursuant to subsections (g) and (j). See *In re White*, 303 Mich App at 710-711.

## A. STANDARD OF REVIEW & APPLICABLE LAW

This Court reviews a trial court's determination regarding best interests for clear error. *In re White*, 303 Mich App at 713. "A trial court's decision is clearly erroneous '[i]f although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citations and quotation marks omitted).

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " '[T]he focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015), quoting *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance Minors*, 306 Mich App at 733.

In considering the issue of whether termination is in the best interest of the minor child, the trial court is permitted to consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, [] the advantages of a foster home over the parent's home . . . the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64 (internal citations and quotations omitted). "In assessing whether termination of parental rights is in a child's best interests, the trial court should weigh all evidence available to it." *Id*. at 63.

## B. ANALYSIS

Termination of respondent's parental rights was in the minor child's best interest. In addition to respondent's inability to improve her parenting skills, stabilize her mental health, obtain suitable housing, and properly take her medications, there also is significant evidence that the minor child was flourishing with his foster family. Dr. Ryan testified that despite respondent's lack of involvement in the minor child's life, he still was in good mental health and was resilient. All of the DHHS workers testified that respondent had a strong bond with his foster family, and especially his foster mother. The minor child also was healthy and happy living with his foster family and, after so long being in their care, looked to his foster mother as his actual mother.

Dr. Rudolph, the psychologist who performed respondent's psychological evaluation and observed her parenting time, testified that the minor child thought of his foster mother as a source of love and affection, and thought of respondent just as someone he saw two times per week. While no one disputed that respondent had a bond with the minor child, his bond with his foster mother undoubtedly was stronger. Rudolph also expressed concern that, given respondent's limitations and inability to understand the minor child's development, she might unintentionally cause him emotional harm. Focusing on the minor child, Rudolph reported that children thrive on a sense of consistency, safety, nurturance and acceptance. In Rudolph's opinion, the minor child found that comfort with his foster mother, not respondent. Furthermore,

the evidence introduced during the proceedings fully supported the trial court's conclusion that respondent simply could not provide those things to the minor child now or in the foreseeable future.

Moreover, respondent's abuse and misuse of medications and unstable mental health could result in a situation where the minor child suffers harm. Respondent was accused of scratching her husband's teenage son during one such episode and she admittedly threw a safe onto the ground while another child was in the room with her. It also is probable that respondent's failure to take her medications, which she claimed resulted in seizures that resulted in her passing out, would lead to the minor child being left unattended and unsafe. Considering this, it is not surprising that not a single witness in the case, but for respondent herself, ever stated that respondent was capable of providing unsupervised parenting time without causing a significant risk of harm to the minor child.

In sum, the trial court did not clearly err in holding that DHHS had shown by a preponderance of the evidence that termination of respondent's parental rights was in the minor child's best interest. *In re LaFrance Minors*, 306 Mich App at 733.

## V. CONCLUSION

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen
/s/ Michael J. Riordan